FILED

2014 Mar-31  AM 09:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TIMOTHY COWAN**, | ) | |
| | ) | |
| **Claimant** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 5:13-CV-00041-KOB** |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| **as acting Commissioner of the Social** | ) | |
| **Security Administration**, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On September 18, 2009, the claimant, Timothy Cowan, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act and Title XVI for supplemental security income. (R. 13). He alleges disability commencing on January 8, 2010, because of left ventricular hypertrophy, severe basal inferior hypokinesis, hypertension, medication side effects, headaches, dizziness, sinus bradycardia, chronic kidney disease, and severe stenosis of the abdominal aorta. (R. 16).

The Commissioner denied the claims on December 30, 2008, and January 28, 2009, respectively. (R. 96-101, 86-90). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on January 26, 2011. (R. 38).  In a decision dated March 9, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, ineligible for disability insurance benefits. (R. 23). On November 30, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision

became the final decision of the Commissioner of the Social Security Administration. (R. 1-4). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents three issues for review: (1) whether substantial evidence supports the ALJ's finding that the claimant's hypertension, chronic kidney disease, bradycardia, and tobacco abuse are non-severe; (2) whether the ALJ properly considered the claimant's noncompliance with his treating physician's plan of care in light of the claimant's financial hardship; and (3) whether the ALJ properly evaluated the claimant's allegations of medication side effects.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation

process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Under step two of the sequential process, the ALJ must determine whether a claimant has

a "severe" impairment or combination of impairments that causes more than a minimal limitation

on a claimant's ability to function. *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). When a

claimant has alleged several impairments, the ALJ has a duty to consider the impairments in

combination and to determine whether the combined impairments render the claimant disabled.

*Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). The claimant

bears the burden at the second step of the sequential evaluation of proving that she has a severe

impairment or combination of impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir.

1999). The Eleventh Circuit has determined that "an impairment or combination of impairments

is not severe if it does not significantly limit [the claimant's] physical or mental ability to do

basic work activities." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

In making a credibility finding, the ALJ "need not totally accept or totally reject the

individual's statements" and "may find all, only some, or none of an individuals's allegations to

be credible...or credible to a certain degree." (SSR Rul. 96-7p, 1996 4-5). Under 20 C.F.R. Section 404.1529(a), if the ALJ discredits the claimant's subjective description of his condition, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)). Such a finding does not require the use of thaumaturgic phrases; all that is required is a clearly supported credibility determination. *See id.* However, the ALJ must explicitly discredit the testimony and must articulate sufficient reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *see also* SSR 96-7p, 1996 4. ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight...").

Next, the ALJ has a duty to elicit testimony and make findings regarding the effect of prescribed medications upon the claimant's ability to work. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). In making a determination of disability, the ALJ must consider the type, dosage, effectiveness, and side effects of any medications. 20 C.F.R. § 404.1529(c)(3(iv).

Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003). If the ALJ relies *solely* on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id.* If the

ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, though, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id.*

## V. FACTS

The claimant has a ninth grade education and was forty-five years old at the time of the administrative hearing. (R. 49, 144). His past work experience involved working as a construction worker, press machine tender, forklift operator, lawn care worker, and loader/unloader. (R. 71-72). The claimant alleged that he was disabled by chronic high blood pressure, blurred vision, blackouts, kidney problems, left ventricular hypertrophy, severe basal inferior hypokinesis, hypertension, medication side effects, headaches, dizziness, sinus bradycardia, chronic kidney disease, and severe stenosis of the abdominal aorta beginning January 8, 2010. (R. 69, 182).

*Physical Limitations*

On August 17, 2006, the claimant visited The Community Free Clinic complaining of high blood pressure and weakness with his current medication. The attending physician diagnosed the claimant with high blood pressure, and prescribed micardis, tenex, and diltiazem. (R. 279). All indications are, and the record does not indicate otherwise, that the claimant received medication for free from the clinic each time the clinic's attending physicians prescribed medication.

On September 7 and 14, October 12, and December 14, 2006, the claimant visited The Community Free Clinic for follow-ups. At the September visit, he complained again of high blood pressure and headaches, and the clinic's attending physician prescribed the claimant

6

micardis, tenex, diltiazem, kcl, and enalapril. Thereafter, he visited the clinic each time because of low medication. At each visit, the clinic's attending physicians renewed the claimant's medication. (R. 275-78).

On December 27, 2006, Dr. Lourdes Corman, the claimant's treating physician, admitted the claimant to Huntsville Hospital complaining of chest pain, headaches, and blurred vision. Dr. Corman diagnosed atypical chest pain, with no acute findings demonstrated; hypertension, but noted the claimant had not been taking his clonidine and would likely rebound when he began again; an adrenal mass, with no other significant abnormality seen; and hypokalemia. Dr. Corman noted the claimant's blood pressure in a range of 139 to 220 systolic and 75 to 106 diastolic during his hospital stay, and that the claimant admitted occasional headaches *especially when he is not taking his medication*. The claimant wanted to leave the hospital on January 1, 2007, and Dr. Corman discharged him. Dr. Corman prescribed the claimant clonidine and lisinopril, and advised him to follow-up with him at The Community Free Clinic on January 16, 2007. (R. 282-90). The record contains no indication that the claimant sought medical treatment again before March 8, 2007.

On March 8, 2007, the claimant visited The Community Free Clinic because of low medication. He also complained of headaches. The clinic's attending physician diagnosed the claimant with high blood pressure and possible Conn's Syndrome, and prescribed the claimant with nitedipinz, micardis, metoprolol, and spironolactone. (R. 274).

On May 21, 2007, Dr. Corman admitted the claimant to the critical care unit of Huntsville Hospital complaining of high blood pressure. The claimant told the emergency room that his blood pressure at home had been markedly elevated. Dr. Corman addressed the claimant's high

blood pressure with multiple medications, including IV labetalol; po clonidine; metoprolol; lisinopril; and hydrochlorothiazide, that Dr. Corman described as mildly successful in reducing the claimant's blood pressure. Dr. Corman diagnosed the adrenal mass as the source of the claimant's hypertension. With multiple medications, Dr. Corman brought the claimant's blood pressure under control. The claimant's renal function normalized after developing acute renal failure because of contrast nephropathy. Dr. Corman prescribed minoxidil, spironolactone, labetalol, potassium chloride, amlodipine, hydralazine, and at discharge, advised the claimant to return to the hospital on June 11, 2007, for admission to remove the adrenal mass and laboratory work. Dr. Corman discharged the claimant on June 6, 2007. (R. 312-13).

On June 11, 2007, Dr. Corman admitted the claimant to the general surgical floor of Huntsville Hospital. Dr. Raymond L. Sheppard performed a left adrenalectomy. Dr. Corman noted that postoperatively the claimant's blood pressure improved, and the claimant was ambulating without difficulty. Dr. Corman continued the prescription for minoxidil, metoprolol, and amlodipine, and discharged the claimant on June 14, 2007. (R. 324-25).

On July 12, 2007, the claimant visited The Community Free Clinic because of low medication. The clinic's attending physician prescribed the claimant diltiazem and micardis. (R. 273).

On July 19, 2007, the claimant visited The Community Free Clinic complaining of chest pains. The clinic's attending physician diagnosed the claimant with high blood pressure and advised him to go to the emergency room. (R. 272). However, no records exist indicating the claimant sought medical treatment again before July 31, 2007.

On July 31, 2007, the claimant visited Dr. M. Asim Khan at The Heart Center for a

cardiac evaluation because of chest pain. Dr. Khan diagnosed the claimant with elevated blood pressure, but noted that the claimant admitted he did not take his medicines. Dr. Khan strongly recommended that the claimant take his medicines regularly.  (R. 333-34).

On August 23, 2007, the claimant returned to Dr. Khan at Huntsville Hospital for a left heart catheterization. Dr. Khan consulted Dr. Saad Rahman for the claimant's renal evaluation and management prior to the heart catheterization. Dr. Khan determined that the claimant's chest pain had been noncardiac in origin; that his hypternsion had been poorly controlled prior to admission but upon discharge, improved with the claimant's use of a beta-blocker and Micardis; and that the claimant's chronic kidney disease had stabilized. Dr. Khan instructed the claimant to follow-up with Dr. Rahman and to follow-up with Dr. Khan on an as needed basis. (R. 340).

On November 29, 2007, January 31, 2008, and February 28, 2008, the claimant visited The Community Free Clinic because of low medication and, at the last visit, complaining of severe chest pains. The clinic's attending physicians diagnosed the claimant with hyptertension and high blood pressure, and prescribed the claimant micardis, toprol, norvase, hctz, and simvastatin. (R. 268-70).

 On July 22, 2008, the claimant visited the emergency room of Huntsville Hospital. The claimant complained of high blood pressure, headaches, and dizziness. Dr. Thomas Calvert diagnosed the claimant with hypertension, administered the medication catapres, and prescribed clonidine. (R. 654-58).

On January 19, 2009, the claimant visited Dr. John Lary for a consultative examination at the request of the Alabama Disability Determination Service. The claimant presented with blurred vision, kidney problems, and high blood pressure. Dr. Lary noted that the claimant's

blurred vision had not been addressed by a doctor. The claimant told Dr. Lary that Huntsville Hospital admitted him for about one month in 2007, and in the intensive care unit for about one week. Dr. Lary obtained the claimant's medical records from The Heart Center, where the claimant was seen after that hospitalization. Dr. Lary found that these records confirmed the claimant's clinical history. Dr. Lary found that the claimant had acute renal failure while in the intensive care unit, but that the claimant's kidneys had returned to adequate function. The claimant reported to Dr. Lary that he independently dressed, ate, bathed, and used no assistive devices, and that Dr. Lary described the claimant as well nourished, healthy appearing and in no acute distress. Dr. Lary found that the claimant's vision was without defict; that he had no headache complaint; that he behaved normally; and that he had no balance problems or dizziness complaints with range of motion or any examination maneuvers. The claimant also completed Dr. Lary's household and personal activities questionnaires on his own, and rated the majority of tasks as "easy" and/or only "mildly" difficult. He indicated on another questionnaire that he had no difficulty with lifting, carrying, handling, climbing, squatting, sitting, using his hands, or driving.

Dr. Lary noted that the claimant should avoid heights, other dangerous environments, and heavy physical exertion until he better controlled his blood pressure. Dr. Lary noted that except for the general limitations related to claimant's blood pressure, his ability to sit, stand, walk, lift, carry, bend, squat, reach, see, hear, speak, understand, and manipulate small objects was unimpaired. Dr. Lary found that the claimant's blood pressure was so high during the exam that he advised the claimant to go immediately to the emergency room. However, the record contains no medical report indicating that the claimant went to the emergency room before his next

treatment record on July 22, 2009. (R. 666-75).

On June 11, 2009 the claimant visited the emergency room of Huntsville Hospital complaining of a recent assault. Dr. Markushewski diagnosed the claimant with hypertension. Dr. Markushewski educated the claimant on the need to continue blood pressure medications. The claimant stated, "I know but I don't care." Dr. Markushewski attempted to explain to the claimant that his blood pressure created a risk of stroke. The claimant then stated, "So? Don't have nobody to care for and nobody cares about me. I'll be alright. Don't worry about me." Dr. Markushewski discharged the claimant and prescribed clonidine. (R. 403-07).

On July 22, 2009, the claimant visited The Community Free Clinic because of low medication. The claimant also complained of "fainting" spells, and the clinic described these as a side effect to clonidine. The clinic's attending physician diagnosed the claimant with high blood pressure, and advised him to return in two weeks for a check-up. However, the record contains no medical report indicating that the claimant went to the clinic for a follow-up before September 29, 2009. The attending physican prescribed the claimant hctz, kcl, lisinopril, and verapamil. (R. 267).

On September 29, 2009, the claimant visited Dr. Benjamin Fail at Huntsville Hospital. The Community Free Clinic referred the claimant to Dr. Fail, although the records do not indicate when. The claimant presented with a headache, chest pain, dizziness, blurred vision, and blood pressure of 170/90. Dr. Fail diagnosed the claimant with uncontrolled hypertension, and advised the claimant to return for a follow-up on October 19, 2009. The claimant did not show up for a follow-up appointment. (R. 389, 692-94).

On December 30, 2009, Dr. Robert Heilpern, a state agency consultant, issued his

physical summary of the claimant at the request of the Social Security Administration. Dr. Heilpern noted that the claimant's allegations of chronic high blood pressure, blackouts, headaches, and blurred vision are somewhat credible and certainly could be attributed to his uncontrolled hypertension. Dr. Heilpern indicated that doctors, through the years, have noted the claimant to be noncompliant with his medications, making the credibility of his allegations questionable. Dr. Heilpern also noted that the claimant's consultative exam on January 19, 2009 was normal with the exception of his blood pressure. Finally, Dr. Heilpern found that the claimant's allegations of kidney problems were incredible as the chronic kidney disease had been resolved. (R. 725).

On January 8, 2010, Dr. Fail admitted the claimant to Huntsville Hospital after he presented to the emergency room with high blood pressure, headache, dizziness, and tightness in his chest. The claimant admitted having difficulty controlling his blood pressure for about a month. The claimant stated that he continued to take medication, including Accupril, Norvasc, and Clonidine. He stated that he nearly passed out three days prior to his hospital visit, and he continued to have some symptoms, such as headache, dizziness, and tightness in his chest. The claimant admitted to smoking marijuana.

The claimant's renal doppler study and CT study of the abdomen and pelvis were negative and a chest x-ray showed clear lungs, unremarkable cardiomediastinal silhouette, and pulmonary vascularity. His creatine level decreased from 1.6 on admission to 1.3 mg/dl on discharge (0.5 - 1.2 mg/dl is normal range). The record contains no evidence that the claimant was in acute distress or obvious discomfort during this visit. The claimant showed no mental status, neurological, respiratory, cardiovascular, gastrointestinal, genitourinary, or

musculoskeletal findings other than elevated blood pressure.

Dr. Fail consulted with a cardiologist and decided to modify the claimant's medications. Dr. Fail noted that the claimant's blood pressure responded to treatment, and slowly improved. Medication brought the claimant's blood pressure under control at 123/81 a day prior to discharge. Dr. Fail's final impression was, "BP controlled in a controlled environment." Dr. Fail discharged the claimant without restriction other than for a low salt diet. Dr. Fail diagnosed the claimant with hypertension, bradycardia, and chronic kidney disease. He prescribed the claimant nifedipie and hydralazine. (R. 726-914).

On February 1, 2010, the claimant followed-up with Dr. Fail. Dr. Fail observed the claimant in no acute distress. The claimant's blood pressure was 160/90; he had regular cardiac rhythm; his creatine remained at 1.3; he had no related complaints. Dr. Fail advised the claimant to continue his medications and to see an orthopedist for complaints of non-cardiac pain. (R. 915-22).

On May 10, 2010, the claimant visited the emergency room of Huntsville Hospital. The claimant complained of high blood pressure and a headache. The claimant reported the headache as a symptom of a recent medication change and denied prior history of similar problems. He denied dizziness and vision problems and his electrocardiogram showed normal sinus rhythm. Dr. Richard Brooks diagnosed the claimant with hypertension, and prescribed clonidine. (R. 382, 366-75 ).

On March 24, 2010, the claimant visited The Community Free Clinic. The attending physician performed a hypertension test. The physician also noted the claimant had not been to the clinic since July 2009, and that hospitals had given samples of medication to him since that

time. The clinic's attending physician diagnosed the claimant with hypertension, and prescribed him aldactone and atenolol. (R. 924).

On November 30, 2010, the claimant visited The Community Free Clinic complaining of back pain. The claimant admitted to the clinic's attending physician that he smoked 3-4 cigarettes daily. The clinic's attending physician diagnosed the claimant with high blood pressure and prescribed an increased dosage of Clonidine. (R. 926).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ on January 26, 2011. (R. 40). The ALJ first asked the claimant when he last drank alcohol. The claimant responded that he last drank alcohol at a New Year's party the previous year in 2010, and prior to that, two years before. The ALJ then asked the claimant how much tobacco he used. The claimant responded that he last smoked six months before, and had quit smoking completely since then.

The ALJ asked the claimant about his multiple violations for driving with a revoked license. The claimant testified that he had no choice because he needed to get to work, and that the police would stop him for something unrelated every time he almost obtained his license again. (R. 44).

The ALJ questioned the claimant about his prescribed medication. The claimant testified that he took his medicine as the doctor's prescribed. The ALJ asked why the claimant's doctors claimed his hypertension was uncontrollable. The claimant testified that even with his prescribed medication, he could not remember a time when his blood pressure was normal. The ALJ then

asked if the claimant's doctors had tried to change his medications. The claimant testified that

doctors had increased his dosages, but that his blood pressure remained uncontrollable. The ALJ

asked the claimant if he had side effects from the increased dosages. The claimant testified that

he experienced drowsiness, dizziness, and decreased energy. (R.45-46).

The ALJ then asked the claimant about his work history. The claimant stated that he

loaded trucks for Southern Foods until 2000 when the plant closed. The claimant testified that he

was a press operator for three to four years at Harding Cooling, but that the company terminated

him when his health issues caused him to miss work. The claimant testified that he was a pipe

fitter at Reed Contracting Services in 2006 and 2007, and that he left that job because he was

incarcerated for his driving violations. He testified that he tried to obtain a job through a

temporary service after his release, but that his health issues led to his tumor surgery. (R. 46-47).

The ALJ then asked the claimant about his education. The ALJ noted that the claimant's

application stated he was illiterate, and that his educational records showed completion of the

eleventh grade, followed by masonry school. The claimant testified that he had actually only

completed ninth grade, and the ALJ asked him to clarify. The claimant testified that he attended

three years of school, but that his credits only satisfied 9th grade requirements. He then testified

that he could not read a paper and that his wife completed his applications. The ALJ asked the

claimant if he had tried to obtain a GED, or if he had tried to learn to read or write. The claimant

testified that he was diagnosed with a learning disability when he was in California. The ALJ

asked how the claimant was able to perform his previous jobs, and the claimant testified that he

had a good memory. (R. 49-50).

The ALJ next asked the claimant if he had any source of income. The claimant stated that

he only received food stamps. The ALJ asked if the claimant had any health insurance or way to get medical treatment, and the claimant said no.

The ALJ questioned why the claimant could not work. The claimant testified that he was tired and did not have any energy. The claimant indicated that he experienced decreased energy from making the bed. The ALJ then asked what the claimant did in a typical day. The claimant testified that he woke up, took his medicine, and would have to lay down again because his medication caused him to lose energy. He would eat, then watch television, and walk to the mailbox. After walking to the mailbox, the claimant indicated that he would feel like he had run five miles. In the evening, the claimant would take his medicine again, and be in the bed about 7:30 PM. (R. 50-52).

The claimant's attorney then asked the claimant if he took his own blood pressure. The claimant reported that he did, and that his blood pressure was normally anywhere from 240 to 180 over 120 to 130. The claimant's attorney then asked the claimant if he experienced any dizziness. The claimant said he experienced dizziness once or twice a day, and seven to eight times a week, lasting 20 minutes to an hour. The claimant testified that his dizziness forced him to lay down twice a day for two to three hours at a time. He then reported that the dizziness usually occurred after taking his medication. (R.52-55).

In addition to the dizziness, the claimant testified that he had experienced blindness. He stated that he had experienced blindness because of his medication before his surgery at UAB on June 11, 2007. (R.54). The claimant testified that he also experienced blurred vision, headaches, chest pain, shortness of breath, sweating spells, and fatigue twice a day that forced him to sit or lay down for up to two to three hours at a time. The claimant testified that he had experienced

16

fainting spells at least three times, causing him to be out for 15 to 20 minutes, and he that had injured himself each time. The claimant testified that he was scared when he recovered from these spells, and was disoriented for around two to three hours after each spell. (R. 62-63).

The claimant's attorney then asked the claimant about his Clonidine medication. The claimant reported that the medication made him tired and fatigued within 20 minutes of taking the medication. He reported that he could not function for a couple of hours, and had to sit or lay down for that period of time. He reported that he could not sit and work during that time because he also experienced blurred vision when he took Clonidine. (R. 64-65). The claimant testified that he quit drinking alcohol because of its effect on Clonidine, and that since December 2007, he had not used alcohol to the point where it would have caused his Clonidine to be ineffective. (R. 68).

The claimant's attorney then asked the claimant about his left adrenal tumor surgery and any problems he had experienced since the surgery. The claimant testified that he had difficulty using the bathroom, and he also experienced cramping in his legs. He reported that he took potassium because his doctors said it would help with his cramping. (R. 65).

The claimant testified that he could only walk 15 feet at time. He also reported that he could only stand for 10 to 15 minutes three to four times a day. He reported he could only sit for 30 minutes at a time once or twice a day because of his cramping. The claimant testified that he could only carry 15 to 20 pounds, and that he had to sit and rest after lifting anything. (R. 66-67).

The ALJ then questioned the vocational expert, Marcia Schulman, about the claimant's work experience. The ALJ asked Ms. Schulman to classify the claimant's past relevant work. Ms. Schulman reported that the construction work was semi-skilled, heavy exertion level; the

press machine work was unskilled, medium exertion level; the forklift operating work was semi-skilled, medium exertion level; the lawn care work was unskilled, medium exertion level; and the loader/unloader work was semi-skilled, heavy exertion level. She continued that the skills or semi-skills the claimant provided are not transferable to light or sedentary work. (R. 71-72).

The ALJ then posed a hypothetical to Ms. Schulman to assess an individual with the following limitations: has the claimant's education, training, and work experience; is limited to a medium range of work; would be limited to occupations that would afford him the opportunity to sit or stand during the work day one or two minutes every hour or so; would be further limited to avoid concentrated hot or cold temperature extremes; would be unable to climb ropes, ladders, or scaffolds; and finally, could have only occasional interaction with hazardous machinery, and no interaction with unprotected heights, or large bodies of water. The ALJ asked Ms. Schulman if such a person would be able to do the claimant's past relevant work. Ms. Schulman reported that the hypothetical person could perform none of the claimant's past relevant work. (R. 73).

The ALJ then asked Ms. Schulman if the individual in the hypothetical could perform any jobs in the national and regional economy. Ms. Schulman reported that such an individual could work as a hand packer, with 8,000 jobs in Alabama and 700,000 nationally; a laundry worker, with 2,400 jobs in Alabama and 221,000 nationally; and a machine feeder, off-bearers, with 3,300 jobs in Alabama and 129,000 nationally. (R. 73).

The ALJ then asked Ms. Schulman to assess a second hypothetical, with the same limitations as the first hypothetical, but an additional limitation that the individual could not perform more than a light range of work. The ALJ assumed that past relevant work is not available, but asked Ms. Schulman if the individual in the hypothetical could perform any jobs in

18

the national and regional economy. Ms. Schulman reported that such an individual could work as an assembler, with 2,800 jobs in Alabama and 215,000 nationally; a cleaner or housekeeper, with 12,000 jobs in Alabama and 917,000 nationally; and a cafeteria attendant, with 2,700 jobs in Alabama and 416,000 nationally. (R. 72-74).

The ALJ then asked Ms. Schulman to assess a third hypothetical, with the same limitations as the first and second hypothetical, but an additional limitation that the individual would miss one to two days of work per month due to his health problems. The ALJ assumed that past relevant work is not available, but asked Ms. Schulman if the individual in the hypothetical could perform any jobs in the national and regional economy. Ms. Schulman reported that the examples given previously would still apply even if the person missed one to two days of work per month. (R. 74).

The ALJ then asked Ms. Schulman to assess a fourth hypothetical, with the same limitations as the previous three hypothetical, but an additional limitation that, during a work week, the individual would require a time-off task of two hours total during the workday for one day out of the work week. The ALJ assumed that past relevant work is not available, but asked Ms. Schulman if the individual in the hypothetical could perform any jobs in the national and regional economy. Ms. Schulman reported that no employer would tolerate the hypothetical, and that no jobs existed for such an individual if the time off occurred on a regular basis. (R. 74-75).

The claimant's attorney then asked Ms. Schulman if gross vision, or blurred vision that was fairly uncontrolled at least two hours out of every day, would impact the hypothetical situations. Ms. Schulman reported that the limitation would preclude the work. (R. 76-77).

The attorney then asked Ms. Schulman to assess whether an individual with the following

19

limitations could work: suffers from medication side effects; has heart problems and uncontrollable hypertension; suffers from fatigue; and must recline for 45 minutes to two hours a day. Ms. Schulman testified that such a hypothetical individual would be unable to engage in any type of substantial gainful employment in the regional or national economy. (R. 77-78).

*The ALJ's Decision*

On March 9, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 23). Before announcing her findings of fact, the ALJ described in great detail the five-step sequential evaluation process that would be the basis of her analysis. (R. 14-15).

First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through September 30, 2010. Then, under the first step of the five-step sequential evaluation process, the ALJ found that the claimant had not engaged in substantial gainful employment since January 8, 2010, the alleged onset date of his disability. *Id.*

Next, under the second step of the five-step sequential evaluation process, the ALJ found that the claimant had the following medically determinable impairments: hypertension, chronic kidney disease, bradycardia, and tobacco use. The ALJ then determined that these impairments do not singly or in combination manifest the specific signs and diagnostic findings required for a severe impairment to limit the claimant's ability to perform basic work-related activities for 12 consecutive months. (R. 15).

In support of this conclusion, the ALJ authored an exhaustive time line of the claimant's earlier medical history, carefully noting the claimant's routine noncompliance with recommended treatment. The ALJ indicated that in 2007, the claimant was seen repeatedly at the hospital

20

related to a diagnosis of left adrenal mass that doctors later surgically removed and Conn's syndrome. The ALJ noted that after removal, medical records stated that the claimant had gradual overall improvement of his blood pressure. The ALJ noted that since that surgery, the claimant has sought little medical care, did not require any more repeat hospitalizations or emergency care, and had good response to medication. The ALJ also noted that blood pressure readings and even the creatine levels shown in the medical evidence during the period the claimant alleges disability are similar to those shown years earlier while he was successfully working, including construction work. Moreover, the ALJ explained that the medical examinations at that time, paired with the claimant's current examinations, show no resulting functional limitations. (R.18).

Furthermore, while he alleged the onset of his disability to be January 2010, the ALJ indicated the only significance of that date is the claimant was hospitalized for uncontrolled blood pressure at a time of noncompliance with recommended treatment. The ALJ noted that the medication brought the claimant's blood pressure under control, and that the doctors released him without restriction. Moreover, the ALJ found that the records showed that the claimant sought little medical care since January 2010; that he went months between his seeking medical treatments; that he had no objective findings of related limitations; and that he had no worsening of his symptoms. (R.18).

The ALJ then considered the opinion of Dr. Robert Heilpern, the State agency medical consultant. The ALJ afforded Dr. Heilpern's opinion significant weight because Dr. Heilpern's opinion is consistent with the medical evidence of record. The ALJ indicated that Dr. Heilpern's note showed that the claimant's January 2009 consultative examination was normal with the exception of his blood pressure. The ALJ noted that while Dr. Heilpern stated that the claimant's

allegations of symptoms certainly could be attributed to his uncontrolled hypertension, Dr.

Heilpern also found that, through the years, the claimant was noncompliant with his medications,

making the credibility of his allegations questionable. The ALJ also noted that Dr. Heilpern

further found the claimant's allegations of kidney problems not credible as the chronic kidney

disease was noted as stabilized in the record with his current creatine levels remaining stable and

even better than they were in earlier records. (R. 18).

   The ALJ found no medical opinions in the record during the relevant period indicating

that the claimant had more than minimal limitations on his ability to engage in work-related

activities. The claimant amended his applications to allege disability beginning January 8, 2010,

the date he was hospitalized for uncontrolled blood pressure following noncompliance with

medical care. The ALJ indicated that the claimant's treating cardiologist for that visit, Dr. Fail,

described the claimant as noncompliant with scheduled follow-up visits. The ALJ noted the

claimant's medical records confirmed Dr. Fail's assessment. The ALJ indicated that during the

hospital stay, Dr. Fail stated that the claimant's blood pressure came down with initial treatment.

The ALJ found that the claimant's medical records for renal doppler study and CT study of the

abdomen and pelvis were negative and a chest x-ray showed clear lungs and unremarkable

cardiomediastinal silhouette, and pulmonary vascularity. The ALJ noted the claimant's creatine

level decreased from 1.6 on admission to 1.3 mg/dl on discharge. The ALJ also found that the

claimant's records showed medication controlled his blood pressure a day prior to his discharge.

The ALJ noted that Dr. Fail's final impression was, "BP controlled in a controlled environment."

The ALJ found that the claimant followed-up with Dr. Fail one month later, and that the claimant

was in no acute distress; that his blood pressure was 160/90; that he had regular cardiac rhythm;

that his creatine remained at 1.3; that he had no related complaints; and that Dr. Fail advised him to continue his medications. (R. 19).

The ALJ noted no records showing that the claimant followed-up with treating cardiologist Dr. Fail other than on the one occasion. The ALJ indicated the only other treatment evidence submitted to substantiate the claimant's allegations were two visits to The Community Free Clinic on March 2010 and November 2010, and one emergency room visit of May 2010. While the Free Clinic record indicated that the claimant was seen on other occasions in 2010, the ALJ noted those records were not submitted to support the claim for benefits. At the March 2010 visit, one month after last seeing his cardiologist, the ALJ noted that the claimant reported taking only medication samples and continuing to smoke cigarettes. The ALJ stated that the clinic physician prescribed medications for only two weeks and scheduled the claimant for a follow-up visit. The ALJ noted, however, that the only other treatment records to show the claimant returned were dated November 2010, over eight months later. (R. 19).

The ALJ noted the claimant's May 2010 visit where he reported a headache because of a recent change in medication and where he denied prior history of similar problems. The ALJ indicated that he also denied dizziness and vision problems, and that his electrocardiogram showed normal sinus rhythm. When seen at the free clinic in November 2010, the ALJ found that the claimant's blood pressure was 160/100 with unrelated complaints, and his examination turned up no new findings other than for the elevated blood pressure reading. The ALJ noted that the doctor adjusted his Clonidine, and no records showed that the claimant returned for care at this or any other facility. (R. 19-20).

The ALJ noted that the claimant had sinus bradycardia when admitted for uncontrolled

23

hypertension in January 2010, but that such a finding was inconsistent with a later May 2010 study showing normal sinus rhythm and subsequent office records showing normal cardiac rate and rhythm. Thus, the ALJ found that the claimant's allegation of disability because of sinus bradycardia and recurrent arrhythmias was inconsistent with the objective medical evidence in the record. (R. 20).

The ALJ also found that the claimant's left ventricular hypertrophy, severe basal inferior hypokinesis, and severe stenosis of the abdominal aorta had not been diagnosed or treated during the period he alleged disability. The ALJ noted that the claimant had normal cardiac catheterization findings in 2007 with no indication by his treating cardiologist or any attending physician that he had any symptoms requiring a repeat invasive study. Citing one example in particular, the ALJ indicated that the claimant's treating cardiologist records for 2009 and 2010 showed the claimant to be in no acute distress when seen, with regular cardiac rhythm, and no diagnosis of the stated conditions. Even during hospitalization and when under cardiology care in January 2010, the ALJ noted that the records were absent of diagnosis or treatment for the stated conditions. The ALJ determined that although a possibility exists that a physician diagnosed the claimant with such conditions in the remote past, they were not medically determinable impairments during the period the claimant alleged disability. (R. 20).

The ALJ found that the medical evidence in the record supports the July 2009 opinion of consultative examiner Dr. John Lary. The ALJ noted that Dr. Lary's review of the medical evidence confirmed the claimant's adrenal tumor and acute renal failure while in the intensive care unit, but the claimant's kidneys had returned to normal, or at least adequate functioning. The ALJ found that the claimant reported to Dr. Lary that he independently dressed, ate, bathed, and

24

used no assistive devices, and that Dr. Lary described the claimant as well nourished, healthy appearing and in no acute distress. The ALJ indicated that Dr. Lary's physical examination of the claimant was essentially normal other than for elevated blood pressure for which he advised the claimant to seek immediate medical attention. The ALJ noted the claimant's reported use of Clonidine and other medications, and admission to Dr. Lary that he continued to smoke and drink alcohol. The ALJ indicated that Dr. Lary thought that the claimant's hypertension needed to be better controlled. While the claimant had blood pressure elevation to 225/130, the ALJ found that the records revealed his vision without deficit; that he had no headache complaint; that he behaved normally; and that he had no balance problems or dizziness complaints with range of motion or any examination maneuvers. Further, the ALJ noted that the claimant even completed Dr. Lary's household and personal activities questionnaires rating the majority of tasks as "easy" and/or only "mildly" difficult. He indicated on another questionnaire that he had no difficulty with lifting, carrying, handling, climbing, squatting, sitting, using his hands, or driving. The ALJ found that the absence of objective findings from Dr. Lary supported a finding of nondisability. (R. 20).

Furthermore, the ALJ noted that the record showed that the claimant was noncompliant with recommended medical treatment, particularly regarding his hypertension, even though his treating cardiologist and another attending physician described the claimant's hypertension as being controlled when in a controlled environment, such as a hospital. The ALJ indicated that those same physicians suspected noncompliance to be a problem for the claimant when left to his own devices. (R. 22).

The ALJ stated that she did not reach the decision in the case solely based upon the

claimant's failure to follow prescribed medical treatment for his conditions, including

hypertension, but noted that the record indicated that the claimant's noncompliance with

prescribed treatment made his conditions more uncontrollable. The ALJ found that even in the

absence of compliance with prescribed treatment, the objective, clinical findings in the record did

not show that the claimant had disabling signs or symptoms of chronic kidney disease,

hypertension, or bradycardia. (R. 21).

      The ALJ found that the claimant's allegations of constant vision deficits were

inconsistent with no complaints, findings, or even observations of such deficits when seen for

treatment. He also alleged chest pain with multiple related symptoms that disabled him, but the

ALJ noted the objective evidence was inconsistent with recurrent complaints or findings when

seen for care. While the claimant alleged disabling dizziness and headaches, the ALJ pointed out

that he denied dizziness in May 2010 when he was seen for a headache, and at that visit he even

denied any prior history of problems with headaches. (R. 21). Given the lack of objective

findings when seen for care and other discussion in this decision, the ALJ found that the record

shows the claimant's symptoms and limitations are not of the severity for him to seek more

frequent medical care. (R. 22).

      The ALJ noted that the claimant's alleged symptoms and/or limitations were clearly

inconsistent with the objective medical evidence. The ALJ indicated that, specifically, the

claimant alleged adverse side effects from his medications, specifically Clonidine, which

required him to lie down for hours each day. However, the ALJ noted that the objective evidence

was inconsistent in that he had never reported such problems to treating or attending physicians

and that no physician had restricted him in such a manner. Rather, the ALJ indicated that when

26

seen for care and administered Clonidine in May 2010, the records showed the claimant improved, had no adverse effects, and was discharged ambulatory without problem.

The ALJ also noted that the claimant's allegations of various side effects from his medications, and that the medical records, such as office treatment notes, did not corroborate those allegations. The ALJ found that the claimant's treating physicians prescribed appropriate medications for the claimant's alleged impairments, and that the claimant took the medications, but not as instructed, and that the medical records revealed the effectiveness of those medications in controlling the claimant's symptoms. The ALJ noted that the claimant's treating cardiologist and another attending physician both commented that the claimant's medications control his hypertension when the claimant is compliant. (R. 22).

The ALJ noted that the claimant's lack of seeking medical treatment did not support his alleged disabling symptoms and limitations. Although the claimant testified that he had no income other than food stamps and no health insurance, the ALJ did not find lack of income to be a reason for not seeking medical care. The ALJ indicated that the record lacked evidence that the claimant had sought government subsidized health care, or had sought health care and been turned down due to financial reasons. In fact, the ALJ noted that the claimant received care at a local free clinic for years, but not regularly, and with indications of noncompliance. (R. 22).

The ALJ concluded that the claimant did not have a physical impairment or combination of physical impairments that significantly limited his ability to perform basic work activities. The ALJ noted that the following facts support her decision: the claimant's lack of seeking medical care; lack of complaints to doctors or objective findings from physicians; lack of acute distress in the medical record; diagnostic testing results, including normal cardiac catheterization, normal

sinus rhythm, and stabilized kidney disease; and the lack of any physician finding of functional impairment or disabling symptoms. The ALJ found the claimant's physical impairments, considered singly and in combination, did not significantly limit the claimant's ability to perform basic work activities. Thus, the claimant did not have a severe impairment or combination of impairments. (R. 23). As a result, the ALJ determined that the claimant is not disabled and capable of performing basic work-related activities.  (R. 15).

## VI. DISCUSSION

### 1.    Substantial evidence supports the ALJ's determination that the claimant has no severe impairments.

The claimant argues that the ALJ erred in determining that the claimant's hypertension, chronic kidney disease, bradycardia, and tobacco abuse did not constitute severe impairments. The court finds that the ALJ specifically stated the reasons for determining the impairments were not severe impairments, that she explained her reasons, and that substantial evidence supports her decision.

In this case, the ALJ supported her decision that the claimant's impairments were not severe. Under step two of the sequential process, the ALJ must determine whether a claimant has a "severe" impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function. *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). When a claimant has alleged several impairments, the ALJ has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). The claimant

bears the burden at the second step of the sequential evaluation of proving that she has a severe impairment or combination of impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The Eleventh Circuit has determined that "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

The ALJ concluded that the claimant's medically determinable impairments consist of hypertension, chronic kidney disease, bradycardia, and tobacco abuse. She also found, at step two, that the claimant's impairments, either singly or in combination, were not severe.

As the ALJ noted, the claimant has sought little medical treatment since his adrenal tumor removal surgery in 2007. Lack of treatment is relevant in evaluating the credibility of the claimant's subjective complaints of disabling symptoms. *See* 20 C.F.R. § 404.1529(c)(3(v), 416.929(c)(3)(v). The record shows that the claimant received treatment for his hypertension from the hospital in June 2009, September 2009, January 2010, February 2010, and May 2011; and from The Community Free Clinic twice in 2008, in July 2009, and in March and November 2010. (R. 268, 352, 382, 389, 403, 727). However, aside from these irregular hospital and doctor visits, the claimant has sought little medical treatment for his impairments.

In response, the claimant argues that he did not have health insurance or income. (R. 52). However, the record indicates that the claimant had the option of going to The Community Free Clinic, but he only visited a handful of times between 2007 and 2010 for reasons other than obtaining medication. Furthermore, Dr. Fail's records noted that the claimant did not follow up with treatment at his office, implying that he was welcome at Dr. Fail's office despite lack of income. The Community Free Clinic referred the claimant to Dr Fail, Dr. Fail advised the

claimant to return for follow-up visits, and Dr. Fail prescribed the claimant medication, although the record does not show whether Dr. Fail gave the claimant the prescribed medication.

The claimant has also failed to show that his high blood pressure causes him to be unable to work. The ALJ properly noted that the claimant's medical records lack evidence of functional limitations resulting from the claimant's high blood pressure. In fact, the objective medical evidence shows that during these visits, the claimant's mental and physical exams were mostly normal despite his high blood pressure. (R. 367, 405, 668, 730-31, 850-92).

"[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen,* 791 F.2d 1544, 1547 (11th Cir. 1986); *Moore v. Barnhart,* 405 F.3d 1208, 1213 n. 6 (11th Cir. 2005) ("[T]he mere existence of [ ] impairment [ ] does not reveal the extent to which [it] limit[s] her ability to work or undermine the ALJ's determination in that regard."). In other words, an abnormality that does not cause an impairment will not support a finding of disability. And the claimant bears the burden of proving that a given impairment causes him to be disabled. *Carnes v. Sullivan,* 936 F.2d 1215, 1218 (11th Cir.1991).

In *Russell v. Astrue*, the Eleventh Circuit held that the ALJ did not err by ignoring the claimant's untreated high blood pressure as a severe impairment because no evidence existed that the high blood pressure resulted in her inability to work. 331 F. App'x 678, 681 (11th Cir. 2009). The Eleventh Circuit concluded that the claimant had not identified documentation in her medical records that demonstrated that her high blood pressure caused her to be "disabled." As in *Russell*,  the ALJ in this case correctly found that the claimant failed to show that his high blood

30

pressure significantly limited his ability to work.

Furthermore, the Court in *Russell* dealt with the issue of *untreated* high blood pressure. (emphasis added). Here, the objective medical evidence showing effectiveness of medication further supports the ALJ's conclusion about the severity of the claimant's high blood pressure. "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988) (citing *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir.1987) (footnote omitted)); *see also Epps v. Harris,* 624 F.2d 1267, 1270 (5th Cir.1980).

In January 2010, the claimant received hospital treatment for high blood pressure. (R. 727). The physicians noted that the claimant's blood pressure was high most of the time he was at the hospital, but that it responded to treatment. *Id.* The physician adjusted the claimant's blood pressure medication, and his blood pressure and related symptoms improved and were controlled at discharge. (R. 728). Therefore, as the ALJ noted, medications are relatively effective in controlling the claimant's symptoms. (*See* R. 22).

The opinion of the non-examining state agency physician, Dr. Robert Heilpern, supports the ALJ's decision that the claimant does not have any severe impairments. Dr. Heilpern reviewed the medical records on December 30, 2009, less than two weeks before the alleged onset date. (R. 725). He summarized the medical records, including the findings of the agency's consultative examiner, Dr. John Lary. (R. 666-70, 725).

Dr. Lary examined the claimant on January 19, 2009, and noted that the claimant's kidneys returned to adequate to normal function after his 2007 tumor removal surgery. (R. 666). Dr. Lary noted that the claimant does not use assistive devices and can dress, feed, and bathe

himself. (R. 667). Because of the claimant's high blood pressure, Dr. Lary advised him to go to the emergency room. (R. 667-69) (there is no record of the claimant going to the emergency room after his visit to Dr. Lary). However, Dr. Lary also noted that the claimant's physical and mental exams were otherwise normal. Dr. Lary determined that the claimant should avoid heights, other dangerous environments, and heavy physical exertion, but that the claimant's ability to sit, stand, walk, lift, carry, bend, squat, reach, see, hear, speak, understand, and manipulate small objects is unimpaired. (R. 670). After reviewing Dr. Lary's report, Dr. Heilpern stated that the claimant's symptoms could be attributed to his uncontrolled hypertension, but that the claimant's drinking, smoking, and noncompliance with medication made the credibility of his allegations questionable. (R. 725).

The ALJ correctly gave Dr. Heilpern's opinion great weight. Given the claimant's medical records, including lack of seeking medical treatment, coupled with the lack of subjective complaints when seen by attending or treating physicians, the ALJ correctly determined that the record indicates that the claimant's symptoms and limitations are not of the severity for him to seek more frequent medical care. (R. 22).

Also, the court finds that the ALJ properly discredited the claimant's subjective evidence regarding the limitations and severity of his pain. In making a credibility finding, the ALJ "need not totally accept or totally reject the individual's statements" and "may find all, only some, or none of an individuals's allegations to be credible...or credible to a certain degree." (SSR Rul. 96-7p, 1996 4-5). Under 20 C.F.R. Section 404.1529(a), if the ALJ discredits the plaintiff's subjective description of plaintiff's condition, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*

*v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)). Such a finding does not require the use of thaumaturgic phrases; all that is required is a clearly supported credibility determination. *See id.* However, the ALJ must explicitly discredit the testimony and must articulate sufficient reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *see also* SSR 96-7p, 1996 4. ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight...").

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

If the ALJ decides to discredit the claimant's testimony as to his pain, she must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting the claimant's testimony requires that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Foote*, 67 F.3d at 1562.

The ALJ correctly found that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements

33

concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with finding that the claimant has no severe impairment or combination of impairments.

The ALJ noted that, while the claimant had sinus bradycardia when admitted for uncontrolled hypertension in January 2010, that finding was inconsistent with subsequent studies, such as a May 2010 study showing normal sinus rhythm. (R. 21, 382). She pointed out that the claimant's allegations of disability in part due to left ventricular hypertrophy, severe basal inferior hypokinesis, and severe stenosis of the abdominal aorta are not conditions he has been diagnosed with or treated for during the period he alleges disability. (R. 21). The ALJ also found that the medical records show the claimant had normal cardiac catheterization findings in 2007 with no indication by his treating cardiologist or any attending physician that he has any symptoms to need repeat invasive studies. (R. 21, 340). For example, the ALJ indicated that the claimant's treating cardiologist records for 2009 and 2010 show him to be in no acute distress when seen with regular cardiac rhythm and no diagnosis of the stated conditions. (R. 21). Even during hospitalization and when under cardiology care in January 2010, the records are absent of diagnosis or treatment for the stated conditions. (R. 21, 726-922).

While the claimant alleged constant vision deficits impairing him, the ALJ found that this is inconsistent with the medical record in that there are no complaints, findings, or even observations of such deficits when seen for treatment. (R. 21). Regarding the claimant's allegations of chest pain with multiple related symptoms that disable him, the ALJ indicated that the objective evidence is inconsistent with recurrent complaints or findings when seen for care. (R. 21). The ALJ noted that the claimant alleged disabling dizziness and headaches, but found

that he denied dizziness in May 2010 when he was seen for a headache and at that visit he even denied any prior history of problems with headaches. (R. 21, 366-75). Furthermore, the ALJ found that the subsequent medical evidence is inconsistent with ongoing complaints or findings regarding such problems. (R. 21).

The objective, clinical findings in the record do not corroborate the claimant's subjective complaints of disabling signs or symptoms of chronic kidney disease, hypertension, or bradycardia. The record is consistent with finding that the claimant does not have a physical impairment or combination of physical impairments that significantly limits his ability to perform basic work activities. Therefore, the ALJ applied the proper legal standards and substantial evidence supports her decision that the claimant has no severe impairment.

> ### i.   The ALJ properly considered the Claimant's financial status and poverty in evaluating the claimant's noncompliance with treatment.

The claimant alleges that the ALJ applied the wrong legal standard in finding that the claimant's lack of income was not a reason for seeking medical care. (Doc. 8 at 10). Refusal by a claimant to follow prescribed medical treatment without good reason will preclude a finding of disability. 20 C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison,* 355 F.3d at 1275. If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id.* If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, the ALJ does not commit reversible error by failing to consider the claimant's financial situation. *Id.*

In this case, the ALJ did not substantially base her decision on the claimant's

noncompliance. The ALJ focused on the inconsistencies between the claimant's subjective allegations, and the claimant's medical history indicating he has no severe impairments. Specifically, the ALJ also focused on the claimant's failure to stop smoking and his failure to take medication in considering the claimant's failure to comply with treatment. The ALJ properly noted that the claimant has a history of noncompliance with treatment, including cessation of cigarette use. (R. 18). The record shows that the claimant was smoking cigarettes and drinking alcohol before and after his alleged onset date. (R. 367, 403, 422, 440, 667, 729, 824, 924, 926). The claimant testified that he quit smoking six months before the ALJ hearing. (R. 44). In January 2010, the claimant admitted to smoking marijuana. (R. 824).

Poverty certainly could have bearing on the claimant's ability to stop smoking if he could not afford treatment, but, as the ALJ properly noted, poverty did not seem to be a reason for the claimant's failure to take medication or receive treatment. (R. 22). The claimant received medication from The Community Free Clinic that he visited sporadically. Dr. Fail also noted that the claimant did not follow-up with treatment at his office, implying that Dr. Fail welcomed the claimant, despite his lack of income. (R. 729). The claimant repeatedly failed to follow-up when instructed to do so, including at visits in January 2007, July 2007, January 2009, July 2009, and October 2009. (R. 282-90, 272, 666-75, 267, 692-94). Furthermore, the claimant admitted after to not taking medications.

Ultimately, however, the ALJ determined that the record suggested the claimant's symptoms and limitations were not of such severity for him to seek more frequent medical care. She did not substantially or solely base her finding of nondisability on the claimant's noncompliance with his treatment, and thus, she applied the proper legal standard in assessing

36

the claimant's poverty.

The claimant also argues that the ALJ applied the wrong legal standard by finding that "there is no indication in the record that the Claimant has sought government subsidized healthcare." (R. 22). The claimant seems to argue that the ALJ improperly relied on lack of Medicaid as a reason to deny his SSI claim, a claim which would determine his eligibility for Medicaid. (Doc. 8 at 15). However, the ALJ did not mention Medicaid, and the record is unclear as to which government program the ALJ was referencing. As noted above, though, the claimant had access to The Community Free Clinic and also received treatment from hospitals and Dr. Fail. Despite having access to these resources, the claimant only received treatment a few times for his blood pressure. Furthermore, any error by the ALJ in making her statement is harmless because as discussed above, she based her decision on the claimant's medical records and inability to follow prescribed medical treatment in finding that the claimant is not disabled.

**2.      Substantial evidence supports the ALJ's finding regarding the claimant's medication side effects.**

The claimant next argues that he experiences side effects of drowsiness, blurred vision, light-headedness, shortness of breath, and that "substantial evidence does not support the decision of the ALJ to reject the limiting effects of the Clonidine." (Doc. 8 at 21).

The ALJ has a duty to elicit testimony and make findings regarding the effect of prescribed medications upon the ability to work. *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). The Commissioner's regulations require that, in making a determination of disability, the ALJ must consider the type, dosage, effective and side effects of any medications. 20 C.F.R. § 404.1529(c)(3(iv).

Here, the ALJ did, in fact, address the side effects in her decision, noting that the record

37

lacks evidence that the claimant consistently reported problems with medication side effects to his physicians, or that his physicians restricted his activities due to those side effects. (R. 21); *See Colon ex rel. Colon v. Commissioner of Social Sec.,* 411 Fed. App'x 236, 237 (11th Cir. 2011) (unpublished) ("Substantial evidence supports the ALJ's decision to discredit Mr. Colon's complaints as they related to medication side effects: none of Mr. Colon's doctors reported any side effects from his medications, and he did not complain to them of any side effects."). As the ALJ noted, the hospital administered Clonidine in January and May 2010, the claimant's condition improved, and Dr. Fail noted no adverse effects. (R. 368, 727, 825). The Community Free Clinic noted in July 2009 that the Claimant reported medication side effects from Clonidine, but the physician merely adjusted the medication and advised the claimant to cease smoking. (R. 267). The record contains no evidence that the physician restricted the claimant's activities because of the side effects.

This court finds that ALJ specifically evaluated the claimant's medication side effects and made a finding regarding whether they render him disabled. As such, this court finds that the ALJ applied the proper legal standards and that substantial evidence supports her decision.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the Commissioner applied the proper legal standards and that substantial evidence supports her decision. Therefore, the court finds that her decision is to be AFFIRMED.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 31st day of March 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE